### ZIMMERMAN et al. v. UNITED STATES.

(Circuit Court of Appeals, Sixth Circuit. July 8, 1924.)

Nos. 4001, 4018.

**Escape ⊜⟞3—When custodian "voluntarily suffers" prisoner to escape stated.**

In Criminal Code, § 138 (Comp. St. § 10308), making it an offense for one who has in his custody a federal prisoner to voluntarily suffer such prisoner to escape, the words "voluntarily suffer" imply a willful or intentional permission to escape, and carelessness, of whatever grade, does not constitute the offense.

In Error to the District Court of the United States, for the Western Division of the Northern District of Ohio; John M. Killits, Judge.

Criminal prosecution by the United States against Sam Zimmerman and Andrew Szmetko. Judgment of conviction, and defendants bring error. Reversed.

Ben W. Johnson, of Toledo, Ohio (Curtis T. & Ben W. Johnson, of Toledo, Ohio, on the brief), for plaintiffs in error.

George E. Reed, Asst. U. S. Atty., of Toledo, Ohio (A. E. Bernsteen, U. S. Atty., of Cleveland, Ohio, and Geo. E. Reed, Asst. U. S. Atty., of Toledo, Ohio), for the United States.

Before DENISON, MACK, and DONAHUE, Circuit Judges.

PER CURIAM. In a memorandum opinion, denying a motion for new trial and sentencing the defendants to 21 months in the penitentiary, the trial judge summarizes the situation as follows:

"The defendants in this case were jailers and deputy sheriffs of Lucas county, Ohio, and as such, on the occasion of the commission of the alleged crime, were directly in charge of federal prisoners confined in the county jail. They were jointly indicted, because of the escape of three federal prisoners under their care, under section 138 of the Criminal Code (Comp. St. § 10308), which reads as follows: 'Whenever any marshal * * * or other person has in his custody any prisoner by virtue of process issued under the laws of the United States * * * and such * * * other person voluntarily suffers such prisoner to escape,' he shall be punished as provided therein. * * *

"The escaping prisoners were very desperate convicts found guilty of participation in the robbery of the Toledo post office. One was known to be an escaped 'lifer' from a California prison, who had but a short time before twice attempted to escape from the local jail. Zimmerman, one of the defendants, had been a deputy for about eight months and for some time had served as one of the turnkeys and in the position occupied on the occasion in question. Szmetko, the other defendant, had been a deputy for four or five months and had also served as an inside officer or turnkey. Each was acquainted with the importance of the prisoners in question and their character. The sheriff had jointly impressed upon all of his subordinates, including the defendants, the necessity of extreme care and unusual watchfulness respecting these prisoners, and it was insisted that no possible precaution to safeguard should be neglected respecting them. The day in question was a public holiday (Labor day, September 5, 1921), when visitors and the public generally were excluded; all avenues of entrance to either the jail yard or building being closed and locked. It was known that the sheriff and all others connected with the keeping of the jail were to be absent on other business, and that the two defendants were to be the only jail attendants in the buildings. The sheriff took precaution to emphasize his instructions respecting care on this special occasion. * * * The jail was provided with the best appliances known to present-day science for accomplishing its purposes. The yard was surrounded by an iron fence of perpendicular bars, pointed at the top and seven or eight feet high. It was bounded by streets on three sides, except for a power house in one corner. The rear of the yard was separated from adjoining property by an open space beyond the fence. The gates in the fence being securely locked on such a holiday as this, once in the yard an escaping prisoner would be put to some time and difficulty in scaling the inclosure, and in so doing he would be visible to passersby on at least two streets, the yard being in the heart of the city and each of the streets being a more or less prominent thoroughfare.

"The jail proper was separated from the sheriff's residence, the two forming one building, by a transverse hall with a door to the yard at either end. Once in the hall, a person's access to the yard was easy. One entering the jail or lock-up from this hall was obliged to pass through a barred door, which hung on rollers and was opened or closed by sliding. It was designed to close itself by gravity, or at least through the application of a slight force. Once locked, it could be opened only by a key in the possession of the jailer. This key was not kept in the ordinary ring of keys carried by turnkeys, but was otherwise held. An order required that, when the jail was closed to the public, this door should be kept locked. It was the last bar to freedom to an escaping prisoner, except the jail yard fence.

"The sliding door led into the chief turnkey's office or prisoners' reception room, a small apartment through which all prisoners to be confined must pass. Entering this office from without, one found on the right a rail extending into the room about eight feet, on the other side of which stood the chief turnkey's desk. Facing this desk, and at a distance of less than eight feet, was the barred and always locked door into the first floor cell room or ward, which was flanked by cells and on the left in part by a stairway, which, with one landing turn, reached a similar cell room on the second floor, whence a stairway of the same character as the first, and directly

over it, led to the third floor cell room or ward. The turnkey at the desk was provided, of course, with a weapon, in the drawer at his right hand being a loaded revolver. Immediately behind him, convenient to his reach, without leaving his chair, was a pull, which was designed to sound, and on this occasion would have sounded, a riot call at the police headquarters six or seven blocks distant. Regulations were in force in the police department providing for a speedy answer to such a call at all times.

"These provisions made it inevitable that the man at the turnkey's desk could command the door in the cell room or ward, into which he could see from his seat. With his weapon he could indefinitely hold away from the door any one trying to open it from the inside. By means of the riot pull, which he could reach without abandoning his command of the door for an instant, he might bring to his assistance in an extremely short time an adequate force of policemen.

"The defendant Zimmerman was placed at the turnkey's desk, with definite instructions to stay there under all circumstances, and not to go into the cell room or ward, no matter for what reason. He had held this position before. The other defendant, Szmetko, was stationed in the cell rooms, to patrol all the floors. The prisoners who escaped were confined in the so-called 'bull pen,' on the third floor on the right side, provided for the more important prisoners. This inclosure was bounded on two sides by rows of cells, 18 in all, the rows facing each other, with their backs to passageways, their only doors opening into the pen. The other two sides of the bull pen were barred partitions, one separating it from a passageway, which, in connection with those behind the cells, formed a corridor around and dividing the cells and pen entirely from the outer walls of the jail. The remaining side of the bull pen faced the cell room or ward into which the third flight of stairs came. In this side was the only door to the bull pen, which on this occasion was occupied by more than thirty prisoners. It was in this apartment that prisoners so confined were fed, through an aperture in the partition separating it from the cell room or ward already described. The door into the bull pen was not secured by lock and key, but by three bolts so beveled on their inner sides that pressure from without would cause them to spring into place to lock the door. Thereafter they could not

be withdrawn and the door opened to allow egress of an inmate of the bull pen until, by use of a key, a steel cabinet at the right was opened and certain levers therein thrown. The levers in this cabinet also locked and unlocked the cell doors opening into the bull pen. It was contrary to regulations to open the bull pen door until the prisoners therein were ordered into the cells and the doors thereto locked by throwing appropriate levers in the cabinet described. * * * The chances of escape, especially on a holiday, were so meager as to be negligible, given any reasonable attention to duty on the part of jailers. Human ingenuity could go no farther in providing either means or regulations to secure prisoners. Only a series of aggravated defaults on the part of the human element would make escape possible, especially on a holiday, when everything was locked and the public rigidly excluded.

"The escape was effected just after the noon hour through a default by the defendants respecting every instruction dealing with the operation of these instrumentalities of safe-keeping. Had either of the defendants planned to disregard his instructions, the situation could not have been worse. The prisoners in the bull pen had been fed and were still at large therein. Two versions are offered of what happened there. One of the witnesses for the government, a fellow jailer of Szmetko, testified that the latter explained to him, a short time after the occurrence, that the prisoners got through the door from the bull pen by this ruse: Schultz, one of them, had received a bucket of soup from the outside, a receptacle too large to pass through the feeding aperture in the bull pen partition. While standing by his cell door, which was immediately adjacent to the bull pen door, Schultz asked Szmetko to open the latter that the bucket might be passed out. This Szmetko, in violation of his instructions, did, whereupon the released door was pushed violently against him and he was immediately attacked by the three prisoners. A colored prisoner, testifying for the government, and who observed the transaction, also stated that this was the occasion of Szmetko opening the door. This defendant, however, gave in testimony a different explanation. He said that Schultz, standing by the bull pen door, said to him that the door was unlocked, and that thereupon he (Szmetko) thoughtlessly unlocked the cabinet and threw the appropriate lever that he might obtain the means of locking it, but

that, in the operation, he unlocked it, whereupon the inmates pushed the door open and attacked him. * ' ' The men got into the third floor cell room, overpowering Szmetko, hitting him over the head with a billy made out of a bed strap and buckle, and threatening him with a small casekmfe in the hands of one. Szmetko also insisted that he was hit over the head with the bucket. An uproar seems to have ensued immediately from cries of the prisoners and a call by Szmetko. Just before this occurrence, the jail physician, accompanied by a friend, had come in and was in the turnkey's room, being admitted thereto by Zimmerman, who, in doing so, failed to spring the sliding door thereto into the locked condition. Zimmerman says that he heard the uproar and thought it was occasioned by some insane patients; that thereupon he thoughtlessly sprang from his seat behind the turnkey's desk, unlocked the door into the first floor cell room, locking it behind him, and proceeded up to the first flight and nearly to the top of the second flight, or the third floor, when he was met by the escaping prisoners, who tackled him, pushing him against the stair rail, and began to beat him. He had been followed by the doctor, to whom, when he appreciated that the prisoners were escaping, he threw his keys, warning him to 'beat it.' The doctor retreated into a cell on the first floor, closing the door and safeguarding himself from the escaping prisoners, who, after overpowering Zimmerman, unlocked the door to the turnkey's office with keys taken from Szmetko, passing thence through the unlocked sliding door, to which they had no key, to the outside passage into the yard, scaling the fence, and escaping. Zimmerman also retreated to another part of the first floor cell room, away from his office and the riot call pull, and shouted through a window to an individual on Canton street 50 or 60 yards away, asking that the police be summoned by telephone."

The court and jury viewed the premises. It may be added that the defendants had borne a good reputation in the community. After the charge, the jury deliberated the entire day and night, and on the following day were given additional instructions. In the light of the facts as recited, we come to a consideration of the vital parts of the court's charge, to which exceptions were duly taken, defining and explaining the nature of the offense:

"Now, I call your attention to the words here, 'voluntarily suffers'—he who, being an officer charged with the responsibility for the safe-keeping of a federal prisoner, 'voluntarily suffers' that prisoner to escape is guilty of the offense. Mere disobedience of orders or carelessness or negligence however gross would not alone, under this statute, make either defendant guilty—such conditions, standing by themselves and incapable of reflecting the mental attitude towards the situation which is involved in this case. If, however, such acts of omission or commission are seen beyond a reasonable doubt, respecting either defendant, to be the fruit of the indifference to the performance of his duty accompanied, respecting such defendant, by a willingness that a prisoner under charge might escape, then the defendant as to whom such circumstances concur to a reasonable certainty is guilty. Of course, indiscreet or even disobedient action through fear or excitement, in the face of an unexpected emergency, or through a misjudgment of an unexpected situation, without any thought or willingness that a prisoner should escape, is not guilt.

"The word 'voluntarily' here in this statute means a mental attitude towards a situation that is acquiescent—willing that the result following should actually happen. It means an absence of accidental results. It is not true that this jury should find, in order to find the guilt of either one of these defendants, that he acted with deliberation or with a willful or evil or a corrupt motive. The jury must, however, because of the presence of the word 'voluntarily,' find a mental attitude of acquiescence, a conscious surrender of the defendant's intention to perform his duty before it can convict. And the word 'suffer,' the expression being 'voluntarily suffer,' means not merely a passive nonresistance, but it involves a willingness to have the result to occur with a conscious avoidance of the means available to prevent the result."

When the jury on the following day asked for further instructions, the court, after explaining that "the government was not called upon to prove any motive at all," proceeded:

"An officer who voluntarily suffers a prisoner to escape is under this statute. He may voluntarily suffer the escape for any reason whatever, from a cowardly or an indolent, as well as for a corrupt, crooked, reason. So all the government needs to do is to show the facts, and ask the jury, as you have been asked in this case, to consid-

er whether or not to a reasonable certainty the escape was due to the acquiescence in any appreciable degree of the officer charged with voluntarily suffering that escape. You don't have to find any reason for it as a substantive part of the case. You are to find an appreciable degree of mental activity on the part of the man charged. As I undertook to make clear yesterday, it need not have been premeditated; it need not have been prearranged; it need not have been the result of co-operation between the two officers charged. It need not have been the result of an intention on the part of one officer to add to the blunders of another. * * * The statute in other words is designed to punish in a case of this character what we loosely call criminal carelessness. * * * There might be in some cases proof of collusion between the officers themselves, and if that proof were in such a case, then the question of mental acquiescence, acquiescent carelessness, would be so plain that you would not have any trouble at all. * * *

"But I will repeat there is no obligation on you to find any motive. The obligation on you is to find a voluntary suffering of an escape; some mental attitude towards the situation on the part of the man charged which resulted in his not doing, constantly avoiding to do, the things which he might have done to save what happened."

And after an exception, the court, explaining further, said:

"You must find this mental attitude, this acquiescence, even if it is nothing but acquiescent carelessness; you must find that to exist in the case of either defendant to a reasonable certainty somewhere along the stage of the proceedings at an important time when otherwise the result would have been different, before you can convict such defendants."

As throwing light upon the thought intended to be expressed in the charge by the phrase "criminal carelessness," we quote from the trial judge's statement to the jury after the verdict as preserved in the record:

"The statute was designed to punish what amounts to criminal carelessness. Carelessness that might transpire casually but which still was the product of the definite conscious lapse of duty * * * It is a very salutary verdict. No excuse for carelessness—too many ways in which that escape could have been prevented to afford any excuse for carelessness and the statute strikes at criminal carelessness."

And we quote, too, from the memorandum opinion overruling the motion for a new trial, as follows:

"The language of the statute is peculiar. When may one be said to 'voluntarily suffer' a thing to be done? Does the answer depend upon evidence of a positive mental attitude toward the duty involved? We think not. The statute is designed to protect a definite social interest; one of a character so important as to demand that legislation respecting it should be given interpretation as exact as reasonably possible within linguistic limits. Such interpretation, we think, requires, clearly in the interest of public policy, that synonymic gradations be observed. Thus 'voluntarily' here denotes just that acquiescent activity of the will, that degree of favorable consideration of the matter by the one under observation which excludes the possibility of accidental connection; i. e., it is merely the antithesis of 'accidentally,' and not here a synonym for 'intentionally' or 'deliberately.' A voluntary mental relationship to a transaction may exist with design as an element present in a very slight and indefinite degree only, if at all; whereas, 'intent' involves design, and 'deliberation' still more definitely so. In the second word of the phrase, 'suffers,' the Legislature has again used the weakest synonym of a series. 'Suffer,' 'allow,' 'permit,' each involves some degree of mental operation, of course. 'Suffer' and 'allow' are practically equivalent words, and, as such, are but a shade more definite respecting activity of mind than 'tolerate,' while less so than 'permit.' Neither involves admission, or even consent; i. e., one may suffer or allow or tolerate a situation, without being held to admit the validity thereof, or to be consenting. * * *

"We have then an expression, 'voluntarily suffers,' which implies or involves a weak state of acquiescence; a condition in which the object is seen to have taken an attitude of nothing more than agreeable nonresistance or toleration to and of a matter which it was his duty to prevent, when, of course, means of prevention were in his power and known to him. Nor is there involved in the question the idea of evil or wrong intent. There must be seen practically nothing more than a conscious surrender of the performance of duty when yet remains, to the apprehension of the object of consideration, the necessity and the means of dutiful performance."

On the facts as above recited, it seems

clear that accuracy in the definition and explanation of the statutory phrase "voluntarily suffer" was indispensable; the lengthy deliberation of the jury, in a case that apparently had awakened great public interest, but confirms our interpretation of the facts, and leads to the conclusion that any error in this respect compels a reversal. Voluntarily suffering a prisoner to escape is not a technical expression; it required no refined legal definitions or elaborate explanations. The words, in our judgment, clearly refer to acts and omissions on the part of a person in charge of a prisoner intended by him to permit the latter to escape.

We cannot accept the view of the court below that the statute was designed to punish "what we loosely call criminal carelessness," or "acquiescent carelessness," whatever these phrases may mean. The jury might well have concluded from the charge that if the defendants, at the moment of the attack on them, consciously, though in a real sense unwillingly, permitted the prisoners to escape rather than subject themselves to imminent danger, they were guilty of what the court terms acquiescent or criminal carelessness, regardless of a total prior ignorance of the plan to escape. Indeed, these phrases, far from helping to clarify the language of the statute, rather becloud the simpler phrase. They emphasize "carelessness" as sufficient, provided only the jury conclude that it has reached a stage that they are ready to denominate as "criminal," or as "acquiescent."

In our judgment, there is implied, if not expressed, in the statutory phrase, a willful or intentional permission to escape; naturally, direct proof of intent is not required. Recklessness, whether in omission or commission, may justify the inference of such intent; but carelessness of whatever grade is not synonymous therewith. While, as the jury were charged, an evil or corrupt motive is unnecessary, we cannot therefore assent to the further statement that it is likewise unnecessary to prove that the defendants acted with deliberation or with a willful motive.

We conclude that, in a case in which clarity of definition was essential, the charge, accurate though it was in parts, and forceful as a whole, is not free from conflicting, inaccurate, and therefore confusing definitions and explanations of the fundamental question involved. The judgments must therefore be reversed, and the causes remanded.

Reversed and remanded.